UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANIMAL WELFARE INSTITUTE and | ) | |
| FARM SANCTUARY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SONNY PERDUE, in his official capacity as | ) | Civil Action No. |
| Secretary of Agriculture; UNITED STATES | ) | |
| DEPARTMENT OF AGRICULTURE; FOOD | ) | |
| SAFETY AND INSPECTION SERVICE; and | ) | |
| PAUL KIECKER, in his official capacity as Food | ) | |
| Safety and Inspection Service Administrator, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiffs challenge decisions by the United States Department of Agriculture ("USDA") to deny Plaintiffs' Rulemaking Petitions to require the humane handling of billions of chickens and turkeys every year to prevent such products from being "adulterated" within the meaning of the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 451 *et seq.* Although the USDA itself concedes that such inhumane handling practices result in adulterated poultry products that are prohibited under the statute, and the USDA is charged by Congress to prevent such products from entering the food supply, the agency has refused to issue regulations prohibiting these practices.

2.      In 1968—more than five decades ago—Congress declared that "[i]t is essential in the public interest that the health and welfare of consumers be protected by *assuring that poultry*

1

*products distributed to them are . . . not adulterated . . .*" Wholesome Poultry Products Act, Pub. L. No. 90-492, § 2, 82 Stat. 791 (1968) (codified at 21 U.S.C. § 451 (2014)) (emphasis added). Congress has also declared that "[i]t is the policy of the Congress to protect the consuming public from poultry products that are adulterated[.]" Poultry Products Inspection Act, 21 U.S.C. § 454(a). With this clear mandate, Congress directed the Secretary of the USDA to promulgate such "rules and regulations as are necessary to carry out the provisions of" the PPIA. *Id.* § 463(b).

3.     Through the USDA's Food Safety and Inspection Service ("FSIS"), the agency has promulgated regulations requiring poultry facilities to condemn products that are adulterated because they are, *inter alia*, killed by methods other than slaughter, 9 C.F.R. § 381.90, badly bruised, *id.* § 381.89, or contaminated, *id.* § 381.91(a).

4.     However, as documented by Plaintiffs' Rulemaking Petitions, each of these forms of adulteration is frequently caused by inhumanely handling poultry *prior* to slaughter. Hence, it is well within the USDA's authority to *prevent* such adulteration by issuing the requested regulations.

5.     On several occasions, FSIS has acknowledged the link between inhumane handling and adulteration, stating, for example, that, "employing humane methods of handling and slaughtering that are consistent with good commercial practices *increases the likelihood of producing unadulterated product*." U.S. Dep't of Agric. Food Safety & Inspection Serv., Directive 6100.3, *Ante-Mortem and Post-Mortem Poultry Inspection*, rev. 1, at 3 (Nov. 12, 2019) (emphasis added).

6.     Nevertheless, the USDA's current regulations do not prohibit handling practices that have the potential to result in adulteration or death other than by slaughter. As Plaintiffs'

Rulemaking Petitions detail, the existing regulatory scheme ignores major categories of adulteration caused by inhumane handling and fails to bind parties through enforceable mandatory standards that prohibit all such practices.

7.      Defendants' denial of Plaintiffs' Rulemaking Petitions—urging the USDA to issue regulations prohibiting the inhumane handling of poultry *prior to* and *during* slaughter—was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, particularly in light of Defendants' own directives linking inhumane treatment with adulterated poultry products. Defendants' denial of Plaintiffs' Rulemaking Petitions also violates the PPIA, which *mandates* that the USDA issue regulations necessary to prevent adulterated poultry products from entering the food supply.

8.      Defendants' denial of Plaintiffs' Rulemaking Petitions is also arbitrary and capricious because Defendants rely on the "good commercial practices" used by the poultry industry and intended to prevent adulterated products. However, those good commercial practices are formulated by the poultry industry itself, not by the USDA. In addition, those practices are not uniformly applied throughout the industry and do not cover many inhumane practices that result in adulteration. The industry's good commercial practices are also inconsistently applied by USDA inspectors to determine whether a product is adulterated. Hence, the industry's own good commercial practices are therefore demonstrably insufficient to prevent the inhumane handling of poultry that results in adulteration. Therefore, to meet its duty to prevent adulterated poultry products from entering the food supply, the USDA itself must promulgate binding, enforceable standards that prevent the inhumane handling of poultry.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Farm Sanctuary has its principle place of business in this judicial district.

## PARTIES

### A.  Plaintiffs

#### *Animal Welfare Institute*

11.     Plaintiff Animal Welfare Institute ("AWI") is a nonprofit, tax-exempt 501(c)(3) organization whose mission is to reduce animal suffering caused by humans. AWI seeks better treatment of animals everywhere—in the laboratory, on the farm, in commerce, at home, and in the wild. With respect to farm animals, AWI seeks to reduce suffering by identifying and promoting policies that improve the welfare of animals on farms, during transport, and at slaughter. AWI also seeks to reduce the risk of adulteration caused by the inhumane handling of poultry at the slaughterhouse to protect consumers from consuming such adulterated food. AWI brings this case on behalf of its own institutional interests, and on behalf of the interests of its members and their families who consume poultry products.

12.     AWI has for years been trying to convince the USDA to promulgate standards to protect poultry from inhumane slaughter practices. In pursuit of this objective, it met with FSIS and poultry industry officials; prepared reports, newsletters, action alerts, and other materials to better educate its members, legislators, policy-makers, and the general public about these matters; and helped draft legislation. AWI also created a database of the non-binding "good commercial practices" that are used in the industry regarding the treatment of poultry, and submitted requests for records under the Freedom of Information Act ("FOIA") to obtain

4

information about good commercial practices, poultry handling practices, and the results of USDA inspections of poultry plants. AWI also sent formal requests to the USDA requesting enforcement of the PPIA against facilities with a poor track record of protecting birds from inhumane treatment.

13.    AWI spent considerable resources on gathering the information for and preparing both its December 2013 Rulemaking Petition and its May 2016 Letter to the USDA requesting that it establish standards to protect poultry from inhumane practices at the slaughterhouse and thereby prevent such products from being adulterated.

14.    AWI works to protect its members—individuals and their families who consume poultry products—from exposure to poultry products contaminated with pathogens, including *campylobacter*, *salmonella*, and *listeria*—the presence of which are increased by inhumane handling of poultry at the slaughterhouse. AWI's efforts to protect its members from such adulterated products are hindered because Defendants' failure to prohibit inhumane practices that result in adulteration significantly increases the risk of exposure to these pathogens.

15.    Defendants' failure to comply with Congress's mandate to prevent adulterated poultry products, and Defendants' denial of Plaintiffs' Rulemaking Petitions, injures AWI's members who consume poultry products because it means that they will continue to be at risk of purchasing and consuming poultry products that are adulterated. These injuries would be significantly ameliorated if AWI prevails in this case because this would mean that the USDA would have to reconsider its denial of AWI's Rulemaking Petitions and establish standards that would prevent adulterated poultry from entering the food supply.

16.    Defendants' failure to comply with Congress's mandate to prevent adulterated poultry products and Defendants' denial of Plaintiffs' Rulemaking Petitions to establish humane

5

handling standards for poultry also directly conflicts with, frustrates, impairs, and burdens AWI's mission to protect poultry from inhumane practices. As a result, AWI will have to spend more time and resources on alternative ways to advocate for these birds such as obtaining information about their mistreatment and the resultant adulteration of poultry products. Therefore, as a direct result of Defendants' denial of Plaintiffs' Rulemaking Petitions, AWI is forced to divert resources to new efforts to increase the humane handling of poultry at the slaughterhouse and to keep the public informed about the link between inhumane handling and adulteration of these products.

17.     Because of Defendants' failure to prohibit the inhumane handling of poultry at slaughter, AWI now must expend additional resources educating the public about and reporting on the problem, including by revising its report, *The Welfare of Birds at Slaughter in the United States*, which contains information relevant to the humane handling of poultry at slaughter. This report details and analyzes federal and state laws relating to the handling of poultry at slaughter, as well as industry practices, and makes policy recommendations for reducing instances of inhumane handling of poultry. AWI will also have to increase its monitoring of good commercial practices and the violation of such practices through the submission of federal open records requests and by other means. AWI will need to undertake additional measures to educate its members and the public about these issues through its website, social media campaigns, and action alerts.

18.     To monitor the inhumane handling of poultry, and the ways in which it continues to result in adulterated products, AWI will have to divert significant resources to submitting additional FOIA requests for humane handling records involving poultry and to enforcing its rights to obtain such information in a timely manner.

6

19.     AWI will further have to divert significant resources to seek other means of reducing inhumane handling of poultry that would not be necessary, or necessary to the same extent, but for Defendants' unlawful denial of Plaintiffs' Rulemaking Petitions. For example, because the USDA has refused to regulate these practices, AWI will have to spend considerable resources seeking to convince Congress and/or the poultry industry to prohibit such practices.

20.     The resources that AWI will have to expend on this issue could otherwise be spent on different projects in furtherance of AWI's mission to protect all animals, including, but not limited to, animals used in entertainment and exhibition, animals in laboratories, animals raised for food, and wild animals on public lands and in the oceans. Defendants' denial of Plaintiffs' Rulemaking Petitions will require AWI to divert its resources from these very important projects to augment its protection of the billions of chickens and turkeys that are subjected to inhumane practices at slaughterhouses every year.

21.     AWI's organizational injuries are directly traceable to Defendants' denial of Plaintiffs' Rulemaking Petitions. But for Defendants' denial, AWI would not have to undertake these additional efforts on behalf of poultry and AWI members who consume poultry.

22.     AWI's injuries will be redressed if Plaintiffs prevail in this action because this will mean that the USDA will have to reconsider its denial of Plaintiffs' Rulemaking Petitions and issue regulations prohibiting the inhumane handling of poultry at the slaughterhouse, and thereby also reduce the risk of poultry products becoming adulterated.

### *Farm Sanctuary*

23.     Plaintiff Farm Sanctuary is a nonprofit tax-exempt 501(c)(3) membership organization headquartered in Watkins Glen, New York, where it operates a 275-acre shelter that

7

provides a home to more than 800 rescued farm animals, including more than 350 birds. Farm

Sanctuary also operates a sanctuary in Southern California, which is home to approximately 150

rescued farm animals, including more than 60 birds. At both sanctuary locations, Farm Sanctuary

rehabilitates and provides lifelong care to sanctuary residents and offers educational tours to the

public. It brings this case on behalf of its own institutional interests, and on behalf of the interests

of its members and their families who consume poultry products.

24.    Farm Sanctuary works to protect farm animals from cruelty and inspire change in

the way society views and treats such animals. Farm Sanctuary promotes its mission by

providing rescue, rehabilitation, and care for abused and neglected farm animals, offering

services involving adoptions, animal placement assistance, and animal care information, and

conducting a variety of programs and disseminating literature and information to educate the

public about farm animal issues.  Farm Sanctuary also engages in advocacy efforts and

campaigns with consumers, businesses, and communities to encourage them to consider farm

animal issues in their decision-making processes.  In addition, Farm Sanctuary monitors federal

and state legislation, informs the public on legislation and issues involving farm animals, and

works through legislative and other political and grassroots processes to advocate on behalf of

farm animals and advance its mission.  With approximately 1.2 million members and

constituents, Farm Sanctuary is one of the leading farm animal protection organizations in the

United States.

25.    Since its founding in 1986, Farm Sanctuary has advocated for the humane

treatment of farm animals, including birds, and has worked to prevent adulteration of poultry

products on behalf of its members who consume them. In furtherance of these goals, Farm

Sanctuary has worked to expose the inhumane handling that leads to adulteration during

slaughter, as well as campaigns focused on state and federal legislation governing slaughterhouse policies. Farm Sanctuary has also submitted petitions for rulemaking, and pursued civil litigation and criminal prosecutions aimed at improving humane handling of poultry, as well as educational efforts to inform its members and the broader public about poultry handling and the link between inhumane treatment of poultry and subsequent adulteration of these products in the food supply.

26.     Defendants' failure to comply with Congress's mandate to prevent poultry products from being adulterated, and its denial of Plaintiffs' Petitions to issue regulations under the PPIA to regulate practices and actions that result in adulterated poultry products, directly conflicts with, frustrates, and impairs Farm Sanctuary's mission and its ability to protect both is members who consume poultry, as well as the birds that Farm Sanctuary is dedicated to protecting from such inhumane practices.

27.     As a result of Defendants' decision to deny Plaintiffs' Rulemaking Petitions, Farm Sanctuary is forced to redirect its limited time and resources away from other work to engage in activities that ensure that birds are treated humanely at slaughterhouses, and for the protection of its members who consume poultry. This additional work includes, but is not limited to, conducting additional research and investigations to ascertain and demonstrate the link between inhumane handling of poultry and the adulteration of poultry products, educating its members, legislators, government officials, members of the poultry industry, and the public in general about this link, and to increase support for actions and measures to reduce the inhumane handling of birds, and to convince members of the public not to purchase adulterated poultry products resulting from inhumane handling.  Farm Sanctuary will also have to divert time and resources toward requesting information through invocation of the FOIA, state records laws, and

other avenues, about incidents of inhumane handling, resultant adulteration, and ongoing food safety violations involving poultry, reviewing, analyzing, and summarizing such information; and disseminating it to educate its members, legislators, members of the industry, government officials and the general public about these issues, and in furtherance of alternative ways to reduce the inhumane handling and consequent adulteration of poultry.

28.    Defendants' decision to deny Plaintiffs' Petitions injures Farm Sanctuary by failing to protect its members who consume adulterated poultry products caused by inhumane handling and interfering with and burdening Farm Sanctuary's mission to protect birds from inhumane handling. Defendants' denial of Plaintiffs' Petitions is causing and will continue to cause a drain on Farm Sanctuary's resources by requiring it to spend additional organizational resources on the activities outlined above that could otherwise be spent on Farm Sanctuary's other work on behalf of farm animals, including the provision of sanctuary to abused, neglected, and abandoned farm animals. But for Defendants' unlawful decision, Farm Sanctuary would not have to undertake these additional efforts and expend these additional resources. These injuries will be redressed if Plaintiffs prevail in this action because it will mean that Defendants will have to reconsider their denial of Plaintiffs' Rulemaking Petition, which in turn will lead to regulations that prohibit the inhumane handling of poultry at the slaughterhouse, and reduce the adulteration that results from such inhumane handling.

29.    Defendants' failure to comply with Congress's mandate to prevent adulterated poultry products, and Defendants' denial of Plaintiffs' Rulemaking Petitions, also injures Farm Sanctuary's members who consume poultry products because it means that they will continue to be at risk of purchasing and consuming poultry products that are adulterated. These injuries would be significantly ameliorated if Farm Sanctuary prevails in this case because this would

10

mean that the USDA would have to reconsider its denial of Plaintiffs' Rulemaking Petitions and establish standards that would prevent adulterated poultry from entering the food supply.

**B. Defendants**

30.     Defendant Sonny Perdue is the Secretary of Agriculture, and is thus ultimately responsible for the denial of Plaintiffs' Rulemaking Petitions.

31.     Defendant USDA is the federal agency responsible for implementing the PPIA and therefore is also responsible for denying Plaintiffs' Rulemaking Petitions.

32.     Defendant FSIS is the agency of the USDA that is responsible for implementing the PPIA, and is the agency that denied Plaintiffs' Rulemaking Petitions.

33.     Defendant Paul Kiecker is the Administrator of FSIS and is therefore also responsible for denying Plaintiffs' Rulemaking Petition.

**FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF**

**A.     Relevant Statutory and Regulatory Framework**

34.     Congress enacted the PPIA to "provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of . . . poultry products which are adulterated or misbranded." 21 U.S.C. § 452. In enacting the statute, Congress declared that "adulterated . . .  poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for . . . not adulterated . . . poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers." *Id.* § 451. Accordingly, the statute provides that "regulation by the Secretary of Agriculture . . . [is] appropriate . . . to protect the health and welfare of consumers." *Id.*

11

35.     The PPIA prohibits the sale of any "adulterated" poultry product, 21 U.S.C. §

458(a)(2)(A), and gives the Secretary of the USDA the authority to "promulgate . . . rules and

regulations as are necessary to carry out the provisions of" the statute. *Id.* § 463(b).

36.     An "adulterated" poultry product includes, in relevant part, any such product that:

- "bears or contains any poisonous or deleterious substance which may render it injurious to health" *id.* § 453(g)(1), or "which may . . . make such article unfit for human food," *id.* § 453(g)(2)(A);

- "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food," *id.* § 453(g)(3);

- "has been prepared, packaged, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," *id.* § 453(g)(4); or

- "is, in whole or in part, the product of any poultry which has died otherwise than by slaughter," *id.* § 453(g)(5).

37.     FSIS is responsible for implementing the mandates of the PPIA. 7 C.F.R. §

2.18(a)(1)(ii)(A).

38.     Implementing regulations provide that "[p]oultry must be slaughtered in

accordance with good commercial practices in a manner that will result in thorough bleeding of

the carcasses and ensure that breathing has stopped prior to scalding." 9 C.F.R. § 381.65(b).

However, FSIS has made clear that a violation of this requirement with respect to a "single" or

even "small numbers of birds" is *not* considered a violation of this requirement. FSIS Directive

6110.1 (July 3, 2018). Rather, the agency considers a facility to be in violation of this

requirement only where the facility has engaged in so many violations of the requirement "that

the establishment's process is out of control." *Id.* at 4.

39.     The current implementing regulations do not prohibit any other practices that may

be inhumane, other than ensuring that breathing has stopped prior to scalding.

40. For example, the current regulations do not prohibit any other actions that result in the bruising of the birds.

41. The current regulations do not prohibit any other actions that result in the laceration of birds.

42. The current regulations do not prohibit any other actions that result in the birds having their bones broken or dislocated.

43. Inhumane practices that cause bruising, lacerations, and broken bones in birds can result in adulterated poultry products.

44. The current regulations do not prohibit any other actions that result in birds dying other than by slaughter, such as by exposure to extreme temperatures.

45. The current regulations do not prohibit any other actions that result in birds dying other than by slaughter, such as by asphyxiation or blunt force trauma.

46. In 2005, FSIS stated that "there has been considerable congressional and public interest in the humane treatment of animals, including poultry[,]" and issued a Notice in the Federal Register. Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. 56,624 (Sept. 28, 2005) (hereinafter "Poultry Notice"). The Poultry Notice explained that FSIS had thus far refused to amend its regulations to require humane standards of slaughter for poultry because "there is no specific federal humane handling and slaughter statute for poultry." *Id.* at 56,625.

47. In the 2005 Poultry Notice, FSIS provided its non-binding "perspective" on the "treatment of poultry." *Id.* It stated that poultry establishments "may" want to "focus on treating poultry in such a manner as to minimize excitement, discomfort, and accidental injury the entire time that live poultry is held in connection with slaughter" to avoid the poultry becoming adulterated. *Id.* The agency noted that it was providing this "perspective" because "poultry

operations may not be aware of industry guidelines pertaining to the treatment of poultry at slaughter." *Id.*

48.     However, neither the agency's "perspective" nor the "industry guidelines" regarding the humane handling of birds are binding on poultry plants, and hence they are not enforceable by the FSIS under the PPIA.

49.     In July 2018, FSIS issued a Directive entitled "Verification of Poultry Good Commercial Practices." FSIS Directive 6110.1 (July 3, 2018) (hereinafter "2018 Directive"). The 2018 Directive provided:

> instructions to inspection program personnel (IPP) for writing a noncompliance record (NR) for noncompliance with the regulations requiring the slaughter of poultry in accordance with Good Commercial Practices (GCP), as well as instructions for composing a Memorandum of Interview (MOI) when documenting a meeting between IPP and establishment management regarding an observation of the mistreatment of live poultry before slaughter.

*Id.* at 1.

50.     The 2018 Directive acknowledged that the employment of humane methods of handling poultry decreases the likelihood of producing adulterated products.

51.     Although the 2018 Directive noted that, "[i]n general poultry should be handled in a manner that prevents needless injury and suffering in order to produce a commercially marketable product," *id.*, the 2018 Directive makes clear that the only *binding* regulations governing the humane handling of poultry require adherence to "good commercial practices" that "ensures that breathing has stopped before scalding, so that the birds do not drown, and that slaughter results in thorough bleeding of the poultry carcass." *id.* (citing 9 C.F.R. § 381.65(b)). Thus, any other practices, including those that result in discomfort, pain, injury, or death other than by slaughter (such as by asphyxiation, blunt force trauma, and heat or cold stress), that may also result in adulterated poultry products, are not covered by the existing binding regulations.

14

52.    The 2018 Directive specifies that inspection personnel should observe whether, for example:

- Establishment employees are breaking the legs of birds to hold the birds in the shackle, squeezing them into shackles or otherwise mishandling birds while transferring them from the cages to the shackles;

- In cold weather, birds are frozen inside the cages or frozen to the cages themselves; or

- The birds are dead from heat exhaustion [as evidenced by] heavy panting, in addition to dead or dying birds in cages.

*Id.* at 2. However, the 2018 Directive further stresses that those examples "*do not necessarily describe prohibited activities and noncompliance*," *id.* at 2 (emphasis added).

53.    The 2018 Directive also instructs inspectors when inspecting plants "**not** to quote . . . the FSIS *Federal Register* notice - 'Treatment of Live Poultry Before Slaughter'" that was issued in 2005 because "this serves" only as "a guideline for industry" and hence is not enforceable. *Id.* at 4 (emphasis in original).

54.    Other than the agency requirement that poultry plants abide by "good commercial practices" that "ensure that breathing has stopped before scalding, so that the birds do not drown, and that slaughter results in thorough bleeding of the poultry carcass," *id.* at 1, there are no uniform good commercial practices that apply to all poultry plants—i.e., each plant is free to devise its own such practices.

55.    There is no consistency concerning the "good commercial practices" that are employed throughout the poultry industry.

56.    FSIS inspectors also do not uniformly look for or cite deviations from the same "good commercial practices" throughout the poultry industry—i.e., what may be considered to

be inconsistent with a particular "good commercial practice" in one plant is not necessarily considered to be inconsistent with the "good commercial practices" of another plant.

57.     Under existing FSIS regulations, no enforcement action must be taken under the PPIA against a poultry plant for failing to treat birds humanely, even if those practices may result in the adulteration of the product. *See* 9 C.F.R. Part 500.

58.     FSIS often does not make any written record of whether a particular plant is failing to comply with its own good commercial practices ("GCPs"). For example, according to records received by Plaintiffs under FOIA, between 2016 and 2018, the agency did not have records concerning deviations from GCPs for approximately one-third of inspected poultry plants (~100 plants). Given the number of birds that would have been processed by such plants during that time—*billions* of birds—it is inconceivable that there were absolutely no deviations from the plants' GCPs. Nevertheless, such deviations were not recorded by FSIS inspectors.

## B.     Inhumane Handling Results in Adulterated Poultry Products.

59.     As Plaintiffs' Rulemaking Petitions and the numerous references cited therein documented, there is a direct causal link between the inhumane handling of poultry in the slaughterhouse and resultant adulteration of poultry products.

60.     When birds arrive at the slaughterhouse, they frequently remain for hours or days unprotected from the elements in overcrowded transportation crates, sitting in their own excrement while they await workers to release them.

61.     In addition, workers often remove birds from these crates by tipping the crates over, dumping the birds out, or using metal poles to prod the birds out of the crates. Such handling practices cause bird carcasses to be adulterated as a result of lacerations and bruising,

especially when these processes cause birds to fall out of the crates, struggle violently, or to pile on top of one another.

62.     Workers then transfer birds to the slaughter line by grabbing their legs and shoving them into metal shackles where the birds hang upside-down. Workers force birds into these shackles when their legs do not fit by breaking their legs while the birds are still alive. While in these shackles, birds often flap their wings and otherwise struggle violently to escape, which results in bruising, lacerations, dislocations, and hemorrhaging—all conditions that constitute or result in adulteration.

63.     After being shackled, the birds enter what is called a "waterbath," where their heads are submerged in water and they are given an electric shock to render them stunned. A proper stun should render birds insensible to pain when they are subsequently killed. However, if the duration between shackling and stunning is too short, birds risk failing to "settle" on the slaughter line—i.e., they fail to come to a resting state—increasing the likelihood that the birds will not be sufficiently stunned. If the duration between shackling and stunning is too long, birds engage in behaviors like wing flapping that cause dislocated joints, broken bones, and other injuries, which also result in adulteration. Sometimes the current of a waterbath shocks birds *before* they are submerged, inducing wing flapping that causes the birds to miss the stunner, resulting in ineffective stunning or no stunning at all.

64.     After a bird is removed from the waterbath, a worker or machine kills the bird by cutting the bird's neck to sever its jugular vein and carotid arteries so that the bird bleeds out and dies. Many birds—especially those that were improperly stunned—try to avoid this cutting by lifting their heads or flapping their wings, which can result in injuries like bruises and broken bones that in turn render the poultry products adulterated.

65.     After the birds' necks are cut, the birds are placed in a scalding bath of hot water to remove their feathers. Birds whose necks are improperly slit, or not slit at all, die by drowning in this scalding bath rather than by slaughter—which also results in adulteration. These scalding baths can also cause contamination of the birds, as feces, *salmonella*, *campylobacter*, or other contaminants are released from the birds' bodies into the water. Live birds who are placed in the water can inhale these contaminants which results in adulterated poultry products.

66.     Other sources of adulteration that result from inhumane handling pervade the slaughter process. For example, aerosols, water, and contact between carcasses, equipment, and workers' hands are all sources of contaminants like *listeria*.

67.     Such contamination is often difficult to detect and address because of the high speed at which the poultry is permitted to proceed down the processing line. For example, up to 140 birds may be processed per minute, with some plants allowed to increase that speed by 25 percent. *See* 83 Fed. Reg. 49,048 (Sept. 28, 2018).

68.     In addition to these routine sources of adulteration from inhumane handling, overt acts of abuse during the slaughter process frequently cause adulteration.

69.      Undercover investigations have demonstrated that the cruel handling of poultry at slaughterhouses is routine.  *See* 2013 Rulemaking Petition at 15–17.

Blatant acts of cruelty that have been documented include:

    a)  slamming birds into walls,

    b)  crushing birds,

    c)  letting cages deteriorate to the point of impaling birds,

    d)  strangling birds,

    e)  kicking birds,

f)   dumping birds onto conveyor belts with visibly broken legs and wings,

g)   punching shackled birds for "fun,"

h)   continuing to operate equipment that is known to be improperly killing birds, and

i)   ripping birds' heads off.

## C.  Defendants Acknowledged the Link Between Inhumane Handling and Adulteration

70.     Defendants themselves have repeatedly acknowledged the link between inhumane handling of poultry at slaughter and the resulting adulteration of poultry products.

71.     For example, in a 2005 Federal Register Notice, FSIS informed the public that humane treatment of poultry is a "high priority" because "poultry products are more likely to be adulterated if . . . they are produced from birds that have not been treated humanely." 70 Fed. Reg. 56,624 (Sept. 28, 2005).

72.     A 2009 FSIS Directive also acknowledged that "poultry products are more likely to be adulterated, if among other circumstances, they are produced from birds that have not been treated humanely[.]" U.S. Dep't of Agric. Food Safety & Inspection Serv., Directive 6910.1, District Veterinary Medical Specialist: Work Methods, rev. 1, at 14 (Dec. 7, 2009).

73.     However, although FSIS has *acknowledged* the link between inhumane handling and adulteration, it has failed to *prohibit* inhumane handling that causes adulteration, including bruising, broken bones, death other than by slaughter, or contamination.

74.     On information and belief, bird carcasses that are adulterated as a result of inhumane treatment of live birds are not always identified at the plant before being shipped to market and ultimately sold to consumers.

75.     In 2019 alone, American poultry producers slaughtered more than 9.3 billion chickens, about 228 million turkeys, and about 28 million ducks. U.S. Dep't of Agric. Nat'l Agric. Stats. Serv., Poultry Slaughter: 2019 Summary 5 (Feb. 2020).

**D.  Plaintiffs' Petitions for Rulemaking**

76.     On December 17, 2013, Plaintiffs submitted a Petition for Rulemaking (the "2013 Petition") requesting that FSIS issue regulations prohibiting the inhumane handling of poultry at slaughter to prevent adulteration. The 2013 Petition detailed why such regulations are needed to prevent the inhumane handling of poultry at slaughterhouses and to protect consumers from the dangers of adulterated poultry products.

77.     The 2013 Petition included evidence demonstrating the links between inhumane treatment at slaughter and adulteration of poultry. 2013 Petition at 9–17.

78.     The 2013 Petition also described how the current regulations are insufficient to meet the PPIA's objectives and mandates. *Id.* at 17–18. For example, Plaintiffs stressed that the USDA's reliance on "Good Commercial Practices" is inadequate because those practices "do not have the full force of regulation" and ignore "several forms of adulteration or potential adulteration, including contamination, bruising and broken bones." *Id.*

79.     On May 26, 2016, AWI further informed FSIS that, based on AWI's review of records it received in response to FOIA requests, thousands of birds are suffering and dying as a result of being abandoned for extended periods of time—often during extreme weather conditions—in the holding areas of slaughter plants, which causes the bird carcasses to be adulterated. AWI therefore requested that FSIS take action to prevent such practices by revising its regulations to prohibit plants from holding birds under unsuitable conditions or for unreasonable periods of time. AWI requested that FSIS revise its regulations to prohibit such

behavior and to allow inspection personnel "to take action to prevent or respond to acts of intentional animal neglect or cruelty, be it abandoning birds or physically abusing birds, as these acts increase adulteration."

### E.  Defendants' Denial of Plaintiffs' Petitions for Rulemaking

80.     By letter dated November 25, 2019, FSIS denied both Plaintiffs' December 17, 2013 Petition and AWI's May 26, 2016 request for further regulation (which the agency itself characterized as an additional petition).

81.     In denying the Petitions, FSIS stated that "the PPIA does not give FSIS the specific authority to prescribe requirements for the humane handling of live birds at slaughter," despite the fact that the statute gives FSIS broad authority to promulgate regulations to prevent adulterated poultry products, and the agency's own acknowledgment that inhumane practices lead to adulteration.

82.     In denying Plaintiffs' Rulemaking Petitions, the agency also asserted that the requested regulations were not needed because "FSIS regulations require poultry to be slaughtered in accordance with good commercial practices (GCP[s]), which means that poultry should be treated humanely."

83.     However, as detailed *supra*, the GCPs on which the agency relied do not address many forms of adulteration that frequently result from inhumane treatment, including contamination, bruising, broken bones, and dying other than by slaughter. In addition, the GCP practices are exceedingly vague and—as demonstrated by the many instances of routine inhumane treatment and even overt abuse documented above—are insufficient to ensure that poultry products do not become adulterated.

84. FSIS's response denying Plaintiffs' Rulemaking Petitions failed to respond to the Petitions' arguments about the well-established link between the inhumane treatment of birds at slaughter and the resulting adulteration, as well as any of the Petitions' data showing why existing regulations are insufficient to address this problem.

F. **The Inhumane Handling of Poultry Continues to Result in Adulterated Poultry Products**.

85. FSIS's failure to regulate the slaughter of birds to require humane handling results in continued adulteration of poultry carcasses by causes identified in Plaintiffs' Rulemaking Petitions, including death by blunt force trauma, asphyxiation, severe injury, and exposure due to adverse holding and transport conditions.

86. FSIS's failure to promulgate regulations prohibiting blunt force trauma results in continued incidents of birds dying other than by slaughter, including the following cited by FSIS between May 2016 and October 2019:

    a. 80 chickens died when a forklift driver dropped a crate,

    b. 100 chickens were grossly mangled and died when an unsecured cage door popped open and the birds plummeted to the ground,

    c. 53 birds were crushed to death when a forklift operator dropped a cage on its top,

    d. 13 turkeys were crushed to death when three cages collapsed.

87. FSIS's failure to promulgate regulations prohibiting practices causing asphyxiation results in continued incidents of birds dying other than by slaughter, including the following cited by FSIS between May 2017 and October 2019:

    a. 20 chickens drowned in a stunning tank when their heads were left submerged in the electrified water,

    b. 300 chickens died due to suffocation when live birds piled up after the conveyor belt stopped moving,

    c. 150-200 birds died due to suffocation when the hanging belt malfunctioned but the dumping belt continued to operate,

    d. Over 700 birds were assumed to have died of suffocation when the hanging belt stopped running.

88.    FSIS's failure to promulgate regulations prohibiting handling that results in bruising, broken bones, and lacerations causes continued incidents of adulteration, including the following cited by FSIS between November 2018 and March 2020:

    a. A worker repeatedly removed live birds from shackles and threw them into cages,

    b. A worker tossed several crates of live birds six feet, from a trailer onto a conveyor belt, causing some crates to crash into other crates; similar incidents were documented at the same plant on 10 occasions in one month,

    c. A worker repeatedly grabbed birds with his hands and pushed them backwards on a moving conveyor belt,

    d. Over one 5-minute period, 65 turkeys suffered bruising and/or wing fractures when the birds' legs repeatedly hit a bar on the conveyor belt,

    e. Dozens of live turkeys were observed with open wounds, fractures, and mutilation of skin and muscle tissue, possibly due to conveyor belt speed adjustments; similar incidents were documented at the same plant on 10 occasions in four months.

89.    FSIS's failure to promulgate regulations results in birds dying other than by slaughter during transport or in the holding area of plants due to dehydration and hyperthermia or

exposure and hypothermia, including the following examples cited by FSIS between January 2016 and February 2020:

    a.  3,569 birds were dead on arrival due to lack of protection from low temperatures (35° F with 25° F wind chill),

    b.  3,000–4,500 birds were dead on arrival due to overloaded conditions on a truck that was held over from previous shift before slaughter,

    c.  6,093 birds were dead on arrival due to lack of protection from low temperatures (-6° F),

    d.  50% of hens on a truck were dead and their bodies frozen solid after being held on plant premises for 22–28 hours before slaughter with a temperature of 2° F,

    e.  1,500 birds were dead on arrival, and other birds were seen panting excessively, due to lack of protection from high temperatures (over 100° F),

    f.  9,750 hens were dead on arrival with many frozen to their metal cages on the truck due to lack of protection from low temperatures (-8° to -17° F with wind chill of -2° to -32° F).

### PLAINTIFFS' CLAIMS FOR RELIEF

**CAUSE OF ACTION**
**(Failure to Prevent Adulteration Caused by Inhumane Handling at Slaughter)**

90.    Through the PPIA, Congress declared that its policy is "to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles . . . to prevent the movement or sale in interstate or foreign commerce of, or the burdening of such commerce by, poultry products which are adulterated." 21 U.S.C. § 452. The

24

PPIA therefore directs the Secretary of Agriculture to "promulgate . . . rules and regulations as are necessary to carry out the provisions of" the statute, including regulations needed to prevent adulteration that results from the inhumane handling of poultry. *Id.* § 463(b).

91.   By denying Plaintiffs' Rulemaking Petitions, Defendants have failed to "promulgate . . . rules and regulations" regarding the inhumane treatment of poultry at slaughter that "are necessary to" prevent adulteration, as the PPIA requires. *Id.* Therefore, Defendants' denial of Plaintiffs' Rulemaking Petitions is "not in accordance with law" within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A).

92.   By relying on inadequate and unenforced industry-developed "good commercial practices" as a basis for denying Plaintiffs' Rulemaking Petitions, Defendants have acted arbitrarily and capriciously, and abused their discretion within the meaning of the APA. *Id.*

93.   By failing to take any action to *prevent* the inhumane handling of poultry before it occurs, Defendants violated their duty under the PPIA to prevent adulterated products from entering the food supply. Defendants also acted arbitrarily and capriciously and abused their discretion within the meaning of the APA. *Id.*

94.   Defendants' denial of Plaintiffs' Rulemaking Petitions failed to consider important aspects of the problem that were presented in these Petitions. Defendants offered explanations that run directly counter to the evidence before the agency and that the agency itself has previously acknowledged. Accordingly, the agency's denial of Plaintiffs' Rulemaking Petitions is "arbitrary, capricious, [and] an abuse of discretion" within the meaning of the APA. *Id.*

95.   Defendants' denial of Plaintiffs' Rulemaking Petitions injures Plaintiffs as described in ¶¶ 11-29.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court issue an Order:

1.      Declaring that Defendants' denial of Plaintiffs' Rulemaking Petitions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. 706(2)(A);

2.      Vacating Defendants' decision denying Plaintiffs' Rulemaking Petitions;

3.      Ordering Defendants to render a new decision regarding Plaintiffs' Rulemaking Petitions by a Court-ordered deadline;

4.      Retaining jurisdiction of this matter until Defendants have fulfilled all statutory and Court-ordered obligations;

5.      Awarding Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action; and

6.      Granting such other relief as the Court may deem just and proper.

Respectfully submitted,
/s/ William N. Lawton
William N. Lawton

Eubanks & Associates, LLC
1331 H Street NW, Suite 902
Washington, DC 20005
(202) 556-1243
nick@eubankslegal.com


/s/ Katherine Meyer
Katherine Meyer
Motion for *pro hac vice* pending

Animal Law & Policy Clinic
Harvard Law School
1607 Massachusetts Avenue
3rd Floor

26

Cambridge, MA 02138
(617) 496-5145
kmeyer@law.harvard.edu

*Attorneys for Plaintiffs*