UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────

ANIMAL WELFARE INSTITUTE and
FARM SANCTUARY,

                                 Plaintiffs,

vs.

TOM VILSACK, *in his official capacity as
Secretary of Agriculture;* UNITED STATES
DEPARTMENT OF AGRICULTURE; FOOD
SAFETY AND INSPECTION SERVICE; and
PAUL KIECKER, in his official capacity as
Food Safety and Inspection Service Administrator,

                                 Defendants.

───────────────────────────────────────

DECISION AND ORDER

20-CV-6595 (CJS)

Plaintiffs Animal Welfare Institute and Farm Sanctuary filed this action pursuant to 5 U.S.C. § 706(2)(A), the Administrative Procedure Act, alleging that Defendants' denial[1] of Plaintiffs' rule-making petitions was unlawful. Compl., Aug. 13, 2020, ECF No. 1. Now before the Court are the parties' cross motions for summary judgment. Pl. Mot. Summ. J., May 17, 2022, ECF No. 34; Def. Mot. for Summ. J., Jul. 14, 2022, ECF No. 39.

The two chief issues in the parties' motions involve whether Plaintiffs have Article III standing to pursue this action, and whether Defendants' denial of Plaintiffs' 2013 and 2016 rule-making petitions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." For the reasons stated below, Plaintiffs' motion for summary judgment [ECF No. 34] is denied, Defendants' motion for summary judgment [ECF No.

───────────────────────

[1] Strictly speaking, the rulemaking petition was denied by Defendant Food Safety and Inspection Service ("FSIS"). However, for ease of discussion, and because a suit against "a federal agency or federal officers [acting] in their official capacities . . . is essentially a suit against the United States," the Court will refer to Defendants collectively in this decision. *Spinale v. U.S. Dep't of Agric.*, 621 F. Supp.2d 112, 117 (S.D.N.Y.), *aff'd sub nom. Spinale v. U.S. Dep't of Agr.*, 356 F. App'x 465 (2d Cir. 2009) (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (internal quotation marks omitted)).

39] is granted, and the Clerk of Court is directed to close this case.

BACKGROUND

In recent years there has been "considerable congressional and public interest in the humane treatment of animals, including poultry." *Notice: Treatment of Live Poultry Before Slaughter*, 70 FR 56624-01, 2005 WL 2367279 (USDA, Sept. 28, 2005) ("*Notice*"). In 1957, Congress recognized that "unwholesome and adulterated poultry products . . . are injurious to the public welfare . . . ." Accordingly, it passed the Poultry Products Inspection Act ("PPIA"), the purpose of which was later expanded to include "provid[ing] for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles . . . to prevent the movement or sale in interstate or foreign commerce of . . . poultry products which are adulterated or misbranded." 21 U.S.C. § 452. Additionally, in 1958 Congress passed the Humane Methods of Slaughter Act ("HMSA"), 72 Stat. 862, 7 U.S.C. § 1901 *et seq*., which established that it is "the policy of the United States that the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." 7 U.S.C. § 1901.

Defendants United States Department of Agriculture ("USDA"), and Food Safety and Inspection Service, and their officers, have been entrusted with the implementation and enforcement of both the PPIA and the HMSA. 21 U.S.C. § 451; *see e.g., Animal Welfare Inst. v. United States Dep't of Agric.*, No. 6:18-CV-06626-MAT, 2019 WL 3083025, at *1 (W.D.N.Y. July 15, 2019). In the course of their responsibilities, the Defendants have determined that the term "livestock" in the HMSA does not include poultry. *Notice*, 2005 WL 2367279. Rather, Defendants maintain that there is no specific

2

federal humane handling and slaughter statute for poultry, but that under the PPIA "live poultry must be handled in a manner that is consistent with good commercial practices, which means they should be treated humanely." *Id.*

<u>Plaintiff Organizations and their Rulemaking Petitions</u>

In addition to government interest in the humane treatment of animals, there has also been significant interest among private organizations. For instance, the mission of Plaintiff Animal Welfare Institute (AWI) "is to reduce animal suffering caused by people and to seek better treatment for animals everywhere . . . ." Jones Decl., ¶ 7, May 17, 2022, ECF No. 34-4. To advance its mission, AWI spearheads "regulatory, legislative, and judicial initiatives to improve the welfare of animals . . . . [and] expends resources on domestic farm animal matters through advocacy, research, education, litigation, and grassroots activities." *Id.* Similarly, Plaintiff Farm Sanctuary exists "to pursue bold solutions to end animal agriculture and foster just and compassionate vegan living." Von Klemperer Decl., ¶ 8, May 17, 2022, ECF No. 34-5. It does so by operating two animal sanctuaries that provide a home to rescued "farmed animals," and "through animal rescue efforts, public education, and legal and advocacy work." Von Klemperer Decl. at ¶ 7–8.

In 2013, Plaintiffs submitted a jointly-authored document to Defendants captioned, "Petition to issue regulations under the Poultry Products Inspection Act to regulate practices and actions that result in adulterated poultry products." AR000002, Mar. 3, 2022, ECF Nos. 30-2 to 30-4 ("First Petition"). As the caption suggests, the First Petition maintained that current regulations are insufficient to achieve the aims of the PPIA, identified multiple points in the poultry preparation process that they believed to be both

inhumane and to contribute to poultry adulteration, and proposed a series of additional regulations and commercial practices to "identify and Prohibit Standard Slaughterhouse practices and Acts of Abuse and Cruelty that Result in Adulteration." AR000018–19. Defendants acknowledged receipt of Plaintiffs' petition, and noted that it was being considered as a rulemaking petition under the Administrative Procedures Act ("APA"). AR000026.

In 2016, Plaintiffs submitted a two-page letter with the caption "Abandonment of birds at poultry establishments." AR000054 ("Second Petition"). In that letter, Plaintiffs expressed concern that "large numbers of birds are suffering and dying as a result of being abandoned for extended periods of time – often during extreme weather conditions – in holding areas of slaughter plants." *Id.* Plaintiffs again argued that there is a connection between such instances, which they considered to be animal neglect or cruelty, and poultry adulteration under the PPIA. AR000054–55. Consequently, Plaintiffs urged Defendants to revise their implementing regulations and directives under the PPIA to prevent similar incidents in the future. AR000054–55. Defendants again acknowledged receipt of Plaintiffs' letter, and informed Plaintiffs that it was being considered as a petition for rulemaking under the APA. AR000056.

Defendants' Response

On November 25, 2019, Defendants denied Plaintiffs' First and Second Petitions in a single decision, explaining, in pertinent part:

> We have decided to deny your petitions because the PPIA does not give FSIS the specific authority to prescribe requirements for the humane handling of live birds at slaughter. . . . FSIS regulations require poultry to be slaughtered in accordance with good commercial practices (GCP), which

means that poultry should be treated humanely. FSIS inspection activities verify and enforce adherence to GCP at official poultry establishments. Through this existing framework, FSIS addresses the poultry handling concerns that you raise in the petitions.

. . . . As FSIS previously has determined, there is no specific federal humane handling and slaughter statute for poultry (See Federal Register, Treatment of Live Poultry Before Slaughter (70 FR 56624; Sept. 28, 2005)). Thus, PSIS looks to its existing authorities under the PPIA to address the handling of poultry.

Under the PPIA, a poultry product is adulterated if, among other circumstances, it is in whole, or in part, the product of any poultry which has died otherwise than by slaughter (21 U.S.C. 453(g)(5)). Accordingly, the PSIS regulations at 9 CFR 381.90 require carcasses of poultry showing evidence of having died from causes other than slaughter to be condemned. The regulations also require poultry to be slaughtered in accordance with GCP, in a manner that results in thorough bleeding of the poultry carcass, and ensures that breathing has stopped before scalding, so that the poultry do not drown (9 CFR 381.65(b)).

* * *

As you note in the petitions, FSIS provides instructions to inspection program personnel to verify that establishments meet GCP poultry handling and slaughter requirements; the instructions include enforcement actions inspection program personnel are to take when establishments do not meet these requirements . . . . Through such instructions to the field, FSIS acts within its scope of authority under the PPIA on an ongoing basis to enforce poultry establishments' adherence to GCP, which includes the handling of live poultry at slaughter.

Existing FSIS regulations address the handling of poultry by requiring official poultry establishments to adhere to GCP. Related Agency inspection activities enforce GCP requirements. This existing system enables the Agency to identify and prohibit practices that may cause poultry adulteration, as you request in the petitions. As additional rulemaking is not necessary to carry out the Agency's authority under the PPIA to regulate poultry GCP, we are denying your petitions.

AR010706–08.

The Instant Action

Plaintiffs filed the complaint initiating the present suit in August 2020, challenging Defendants' denial of Plaintiffs' rule-making petitions as violations of both the APA and the PPIA. Defendants moved to dismiss the complaint, arguing that this case should be dismissed because Plaintiffs do not have standing to bring their claims, and because the Court does not have subject matter jurisdiction to review an agency's action if that action has been committed by law to agency discretion. Mot. to Dismiss (Memo. of Law), Nov. 23, 2020, ECF No. 10-1. The Court denied Defendants' motion, finding that "construing all ambiguities and drawing all inferences in Plaintiffs' favor, Farm Sanctuary's factual allegations . . . are sufficient to survive a motion to dismiss" on the issue of standing, and that Defendants' denial of Plaintiffs' rule-making petitions was not an agency decision that has been precluded from judicial review as an action "committed to agency discretion" under the APA. *Animal Welfare Inst. v. Vilsack*, No. 20-CV-6595 (CJS), 2021 WL 9455717, at *4–5, 7 (W.D.N.Y. Oct. 13, 2021).

Defendants filed an answer in December 2021, and provided the administrative record to Plaintiffs in March 2022. Admin. Record ("AR"), Mar. 3, 2022, ECF No. 30. Thereafter, the parties filed the cross motions for summary judgment that are now before the Court.

PLAINTIFFS' STANDING

"Standing is a question that determines whether the claimant may properly invoke the jurisdiction of the federal courts to determine the merits of the underlying dispute, and it therefore logically precedes, not follows, that determination." *United States v.*

*$557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002). Consequently, before addressing the merits of Plaintiffs' APA claim, the Court must address the parties' arguments regarding standing.

As indicated above, in denying Defendants' motion to dismiss, the Court stated that "taking Plaintiff Farm Sanctuary's allegations as true, . . . the amended complaint contains sufficient allegations of direct injury to survive the motion to dismiss on the issue of standing." *Animal Welfare Inst*., 2021 WL 9455717 at *5. However, whereas standing was challenged on the basis of the pleadings at the motion to dismiss stage, Plaintiffs' evidence at the summary judgment stage includes declarations from four individuals familiar with the injuries or threatened injuries being alleged. Defendants maintain that Plaintiffs' evidence fails to demonstrate that they have either organizational or associational standing to challenge Defendants' denial of their rulemaking petition. Def. Mem. of Law, 8–12, Jul. 14, 2022, ECF No. 39-1. Plaintiffs disagree.

After reviewing the papers and the evidence, the Court finds that Plaintiffs have failed to demonstrate either organizational or associational standing.

Legal Standard

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted). The "irreducible constitutional minimum of standing" contains three elements: (1) injury-in-fact, (2) traceability, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (quoting *Lujan*, 504 U.S. at 560 (internal quotation marks omitted)). An injury is "particularized" if it affects the plaintiff in a personal and individual way; it is "concrete" if it is real and not abstract, though it does not necessarily have to be tangible. *Spokeo*, 578 U.S. at 339–40. An alleged future injury is "imminent" "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (citation omitted).

With respect to the other two core elements of Article III standing, an injury is "fairly traceable" if the plaintiff can "demonstrate a causal nexus between the defendant's conduct and the injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). It is "redressable" if it is "likely," not speculative, that a favorable decision by a court will redress the injury. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 103 (2d Cir. 2018) (internal citation omitted).

The party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citing, *inter alia*, *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883–889 (1990)). "At the pleading stage, general factual allegations of

injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Nat'l Wildlife Federation*, 497 U.S. at 889). Nevertheless, "at the summary judgment stage, such a party 'can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Clapper*, 568 U.S. at 412 (quoting *Lujan*, 504 U.S. at 561).

<u>Organizational Standing</u>

A plaintiff has "organizational standing" if it can show that "it was directly injured as an organization." *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1992)). In the present case, Plaintiffs attempt to demonstrate organizational standing through declarations from leaders in their respective organizations: (1) Dena Jones, Director of the Farm Animal Program at Plaintiff Animal Welfare Institute (AWI); and (2) Emily Von Klemperer, General Counsel for Farm Sanctuary. Jones Decl. at ¶ 4–6; Von Klemperer Decl. at ¶ 4.

According to Ms. Jones, AWI has suffered a litany of harms as a result of Defendants' denial of Plaintiffs' rulemaking petitions, including the diversion of resources to: contact individual slaughter plants (¶ 23); communicate with third party certification programs about inhumane handling (¶ 24); communicate with Defendants' policy and field operations staff (¶ 25); update its comprehensive report, "The Welfare of Birds at Slaughter in the United States" (¶ 26); regularly submit Freedom of Information Act ("FOIA") requests for plant noncompliance records (¶ 27); seek out and use information to encourage government and plant personnel to improve the treatment of birds being

9

slaughtered (¶ 28); advocate for legislative and regulatory reforms (¶ 29); push for the enforcement of existing state farm animal care provisions (¶ 30); ask the American Veterinary Medical Association ("AVMA") to encourage Defendants to take action (¶ 31); contact industry groups to seek support for their proposed regulations (¶ 32); urge Defendants' "Agricultural Marketing Service" to revise its guidance and stop allowing purchases from certain suppliers (¶ 33–34); and educate consumers and the public about the treatment of birds slaughtered for human consumption (¶ 36).

Further, Ms. Von Klemperer states that the injury to Farm Sanctuary includes: creating a misperception that birds slaughtered for human consumption are treated in a humane manner (¶ 19); authorizing a host of cruel practices (¶ 20); and diverting resources in order to advocate for legislation to protect birds slaughtered for human consumption (¶ 23), contact individual slaughter plants (¶ 24), prepare educational resources to inform its members and the public about the treatment of birds at slaughter plants (¶ 25), submit multiple FOIA requests (¶ 26), encourage government inspection of slaughter plants (¶ 27), advocate for legislative and regulatory reform (¶ 28), and educate consumers through the media (¶ 30).

*Relevant Legal Principles*

The Second Circuit has explained that an injury-in-fact requires a showing that the challenged action did not merely harm the plaintiff's "abstract social interests" but "perceptibly impaired" its activities. *Connecticut Parents Union*, 8 F.4th at 173 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). An organization challenging a law or regulation that it is not directly regulated by must establish a "perceptible

impairment" by showing "an involuntary material burden on its established core activities." *Connecticut Parents Union*, 8 F.4th at 173. Such a showing must include more than simply "claiming to have been injured by any law or regulation touching any issues within the scope of [the organization's] mission . . . so long as it expends resources to oppose that law or regulation." *Id.* Rather, "the challenged law or regulation must impose a cost (e.g., in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission." *Id.* at 173–74. "[E]xpenditures or other activities, if incurred at the organization's own initiative, cannot support a finding of injury." *Id.* at 174.

*Application to the Present Case*

It is undisputed in the present case that Plaintiffs are not directly regulated by the PPIA or its implementing regulations, nor would they be subject to any of the practices or regulations that they proposed in either of their rulemaking petitions. As a result, to adequately demonstrate an injury-in-fact for the purposes of organizational standing, Plaintiffs must show that Defendants' denial of their petitions caused an involuntary material burden on their established core activities. The Court finds that Plaintiffs have failed to satisfy this burden. An examination of a recent Second Circuit case will illustrate why.

In *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) ("*Centro*"), the circuit court considered the standing of a local advocacy organization to challenge an ordinance passed by the Town of Oyster Bay, New York that prohibited the road-side solicitation of employment. The organization,

"Workplace," had the mission of "end[ing] the exploitation of Latino immigrant workers on Long Island . . . by promoting the full political, economic and cultural participation of those workers in the[ir] communities . . . ." *Centro*, 868 F.3d at 107–109. The record in the case demonstrated that Workplace's core activities included regularly "traveling to day laborer sites in Oyster Bay to speak with laborers . . . ." *Centro*, 868, F.3d at 110.

In finding that Workplace met its burden of showing an injury-in-fact, the court noted that the town ordinance would disperse gatherings of the Latino immigrant workers that Workplace sought to serve, and hence that due to the ordinance "Workplace will inevitably face increased difficulty in meeting with and organizing those laborers." *Centro*, 868, F.3d at 110. Additionally, the court stated that "it is also clear that the Ordinance will force Workplace to divert money from its other current activities to advance its established organizational interests (i.e., if the laborers are dispersed, it will be more costly to reach them)," and that "enforcement of the Ordinance would . . . impair its advocacy activities," by causing inadvertent arrests of Workplace representatives. *Centro*, 868, F.3d at 111.

After closely examining the affidavits submitted by Plaintiffs in the present case, as well as the arguments in the papers, the Court concludes that, unlike the plaintiffs in *Centro*, Plaintiffs here have not suffered an involuntary burden on their core activities. Whereas the *Centro* plaintiffs were faced with *new* legislation that significantly altered the conditions under which they operated, Defendants' denial of Plaintiffs' rulemaking petition in this case merely perpetuated the *status quo*. Because Plaintiffs operated under the same conditions both before and after Defendants' action, that action cannot be fairly said to have created a "perceptible impairment" to Plaintiffs' activities.

Although Plaintiffs may have incurred additional expense reacting to Defendants' decision, that spending was not consistent with any circumstance under which the Second Circuit has recognized as an "involuntary material burden." *See, e.g., Connecticut Parents Union*, 8 F.4th at 174 (finding an advocacy group did not have standing to contest racial quotas imposed by the state because "an organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes, even if the organization's own clients request the change."). Indeed, Plaintiff's decision to divert resources from other activities in response Defendants' denial of their rulemaking petitions:

> [was] not an involuntary result of "increased demand for services," *NY v. DOH*, 969 F.3d 42, 60-61 (2d Cir. 2020), or taken to "continue organizing" and advocating, [*Centro*], 868 F.3d at 110. Instead, they [were] activities the Plaintiffs pursued "at their own initiative" in response to [the actions of another organization] which harms their "abstract social interests." *Connecticut Parents Union*, 8 F.4th at 173–74.

*Fam. Equal. v. Becerra*, No. 1:20-CV-2403 (MKV), 2022 WL 956256, at *5 (S.D.N.Y. Mar. 30, 2022).

Before proceeding to a consideration of Plaintiffs' associational standing, the Court notes its cognizance of its finding at an earlier stage of the litigation that Plaintiff Farm Sanctuary had alleged a sufficient factual basis for organizational standing. In making its finding today, the Court has been mindful of the Supreme Court's requirement that a party support its allegations of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. 555 at 561. Plaintiffs' pleadings were sufficient at the allegation stage, but Plaintiffs failed at the summary judgment stage to "'set forth' by affidavit or other evidence 'specific facts'" to demonstrate organizational

13

standing. *Clapper*, 568 U.S. at 412.

<u>Associational Standing</u>

In addition to organizational standing, an organizational plaintiff may demonstrate "associational" standing – also referred to as "representational standing" – by  bringing suit in its own name on behalf of its members. An organization has associational standing if it can satisfy the three elements of standing and: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006) (quoting *Hunt v. Wash. State Apple Adver. Com'n*, 432 U.S. 333, 343 (1977)).

Here, Plaintiff Farm Sanctuary maintains that it has associational standing on behalf of members who are at an increased risk of serving and eating adulterated poultry products as a result of Defendants' denial of their rulemaking petition. In support of this position, Plaintiffs have submitted declarations from two of their members: Jody Hinkle and David Washburn.

Jody Hinkle has been a Farm Sanctuary member for "several years" because she supports "its mission to combat the abuse of farmed animals and support farmed animal welfare," and relies "on Farm Sanctuary for information about animal agriculture and slaughter practices." Hinkle Decl., ¶ 2, May 17, 2022, ECF No. 34-6. She is in her mid-sixties, lives in Grayling, Michigan, and regularly consumes poultry products. Hinkle Decl. at ¶ 4–5. Hinkle states that "[t]he presence in the market of poultry products from birds

treated inhumanely puts me at an enhanced risk of eating pathogenic meat . . . . [and] exposure to poultry products that could be adulterated with broken bones or contaminated with drug-resistant bacteria alarms me." Hinkle at Decl. at ¶ 8. She further declares that she regularly travels an hour to purchase poultry products that she believes to be sourced from birds treated humanely prior to slaughter, but that sometimes she has "no choice but to consume poultry products that [she has] no assurance were sourced from birds that were treated humanely." Hinkle Decl. at ¶ 10–11.

David Washburn has also been a Farm Sanctuary member for "several years," and supports its mission to combat the abuse of farmed animals and support farmed animal welfare. Washburn Decl., ¶ 2, May 17, 2022, ECF No. 34-7. He is a professional chef, and is involved in preparing poultry products for public consumption on a daily basis, purchasing about 180 pounds of poultry products twice a week. Washburn Decl. at ¶ 5–7. Washburn states that he is "concerned that allowing inhumane handling of birds prior to slaughter increases the likelihood that [he] may expose others to foodborne illnesses in [his] capacity as a professional chef." Washburn Decl. at ¶ 13. He further declares that he "would feel horrible if [he] exposed anyone to contaminated poultry products," and that "if an outbreak of foodborne illness were traced to [his] kitchen, [his] professional reputation would be irreparably damaged." Washburn Decl. at ¶ 22–23.

*Relevant Legal Principles*

The Second Circuit has indicated that its leading case on risk-based injury, such as the injury alleged to demonstrate associational standing in this case, is *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003). *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug*

15

*Admin*., 710 F.3d 71, 80 (2d Cir. 2013), *as amended* (Mar. 21, 2013). In *Baur*, the circuit court held that "exposure to potentially harmful products" may satisfy the injury-in-fact requirement of Article III standing in "the specific context of food and drug safety suits." *Id*. at 634. The court declined to define the risk of harm necessary to support standing according to a universal standard, but instructed that the "highly case-specific" analysis should consider both the probability of harm and the severity of the potential harm. *Nat. Res. Def. Council, Inc*., 710 F.3d at 80 (citing *Baur,* 352 F.3d at 641).

*Application to the Present Case*

Considering the probability and severity of harm identified by Hinkle and Washburn in the present case, the Court finds that Plaintiffs have failed to establish an injury sufficiently particularized to satisfy the injury-in-fact requirement of Article III standing. In this regard, an examination of the Second Circuit's application of the *Baur* analysis in *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin*., 710 F.3d 71 (2d Cir. 2013) is instructive.

In that case, the Second Circuit reviewed the district court's grant of summary judgment to the Food and Drug Administration ("FDA") on the issue of whether the Natural Resources Defense Council ("NRDC") had standing to bring an action "to compel the FDA to finalize its regulation of triclosan and triclocarban, two chemicals used in over-the-counter antiseptic antimicrobial soap." *Nat. Res. Def. Council, Inc.*, 710 F.3d at 74. In finding that NRDC did have Article III standing to pursue claims regarding triclosan but did not have standing to pursue claims with respect to triclocarban, the circuit court detailed the differences in the evidence presented. The court explained:

16

The basis for standing for the regulation of triclosan, discussed above, is based on direct, frequent exposure to triclosan combined with the known fact that triclosan enters the human bloodstream, is an endocrine disruptor, and may cause cancer. Exposure to triclosan in this manner is a present injury in which triclosan may work changes directly upon the human body; whether those changes are ultimately harmful may be uncertain, but there is no uncertainty that any harm will be directly caused by frequent direct exposure to triclosan.

The claim that the proliferation of triclocarban may lead to the development of antibiotic-resistant bacteria, in contrast, involves unspecified bacteria or microbes that NRDC members may not ever come into contact with. And in order for those bacteria or microbes to harm plaintiffs, there must be an intermediate step in which triclocarban causes those bacteria to become resistant to antibiotics. This claim thus seems less like a present injury and more like a threatened injury that is contingent and far-off rather than imminent. We therefore conclude that NRDC lacks standing as to the regulation of triclocarban.

*Nat. Res. Def. Council, Inc.*, 710 F.3d at 86.

Like the evidence presented by NRDC to show injury caused by triclocarban in the passage above, the evidence Plaintiffs present here in support of threatened injury caused by Defendants' denial of the rulemaking petitions is "contingent and far-off rather than imminent." To be sure, both the Hinkle and Washburn declarations express concern regarding illness caused by *campylobacter* and *salmonella* bacteria that can be transmitted by contaminated poultry products. *See, e.g.,* Washburn Decl. at ¶ 17–19. Additionally, Plaintiffs have submitted a 2021 press release from Defendant United States Department of Agriculture citing estimates that over 23% of the more than 1 million consumer illnesses caused by the *salmonella* bacteria are caused by consumption of contaminated poultry. Press Release, 2, May 17, 2022, ECF No. 34-3.

Nevertheless, the Hinkle and Washburn declarations involve concerns about *campylobacter* and *salmonella* bacteria that the declarants do not claim to have

encountered in their prior decades of consuming and preparing poultry, and with which it is uncertain that they will ever come into contact. Further, although Defendants have conceded a link between the inhumane handling of birds prior to slaughter and adulterated poultry, Plaintiffs have not demonstrated the inability of Defendants' present inspection regime to detect adulterated poultry prior to its entry into interstate commerce. Rather, the vast majority of Plaintiffs' reported data has been gathered from "Poultry Condemnation Certificates" and citations for non-compliance with General Commercial Practices ("GCPs") obtained from Defendants through Freedom of Information Act requests. *See, e.g.,* Jones Decl. at ¶ 11–26. This suggests that either the poultry that was adulterated due to allegedly inhumane treatment prior to slaughter was properly condemned prior to shipment, or the allegedly inhumane practices were identified and documented with the goal of bringing offending party into compliance with the GCPs.

To the extent that Defendants' 2021 press release admits to a continuing problem of *salmonella* bacteria, the release indicates both that Defendants have initiated "pilot programs" to work toward correcting the issue, and that a "key component" to the approach lies not within the slaughter and processing establishments, but in "encouraging preharvest controls to reduce *salmonella* contamination coming into the slaughterhouse." Press Release at 3. That is, Defendants' indicate the *salmonella* issues lie outside of the establishments that Plaintiffs' rulemaking petition sought to control with further regulation. For these reasons, the Court finds that Plaintiffs' claims seem less like a present injury and more like a threatened injury that is contingent and far-off rather than imminent. *Nat. Res. Def. Council, Inc.*, 710 F.3d at 86. The Court therefore concludes that Plaintiffs have

not demonstrated injury-in-fact sufficient to show associational standing to contest the denial of their rulemaking petitions in federal court.

PLAINTIFFS' APA CLAIMS

Even assuming, *arguendo*, that Plaintiffs had satisfied their burden of demonstrating Article III standing, their claims would fail on the merits.

<u>Legal Standard</u>

As the Supreme Court has repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities. *Massachusetts v. E.P.A.*, 549 U.S. 497, 527 (2007) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–845 (1984)). Therefore, although an agency's refusal to institute rulemaking proceedings is subject to judicial review, such review is "extremely limited" and "highly deferential." *Massachusetts*, 549 U.S. at 528 (*citing Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)).

Under 5 U.S.C. § 706(2)(A) of the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." In reviewing the agency's action, the court must review the administrative record to ensure that the agency examined the relevant data, articulated a satisfactory explanation for its action, and drew a rational connection between the facts it found and the choice it made. *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) (citing *Natural Res. Def. Council, Inc. v. U.S. EPA*, 658 F.3d 200, 215 (2d Cir. 2011)). With respect to an agency's

19

decision to deny a rulemaking petition, this standard is applied "at the high end of the range of deference and an agency refusal is overturned only in the rarest and most compelling of circumstances." *New York v. U.S. Nuclear Regul. Comm'n*, 589 F.3d 551, 554 (2d Cir. 2009) (quoting *EMR Network v. FCC*, 391 F.3d 269, 272–273 (D.C. Cir. 2004)). To deny review of a rulemaking petition, a court typically need do no more than assure itself that an agency's decision was "reasoned," meaning that it considered the relevant factors. *U.S. Nuclear Regul. Comm'n*, 589 F.3d at 554 (quoting *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987)).

Application

A review of Defendants' decision to deny Plaintiffs' rulemaking petition in light of the administrative record and the statutory and regulatory regimes governing poultry production shows that Defendants did not abuse their discretion or reach a decision not in accordance with law.

The PPIA affords Defendants a broad degree of discretion in determining what regulations are and are not appropriate in order "to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles . . . to prevent the movement or sale in interstate or foreign commerce of . . . poultry products which are adulterated or misbranded." 21 U.S.C. § 452. For instance, the PPIA provides that the Secretary of Agriculture may regulate the storage and handling of poultry in the stream of commerce "whenever the Secretary deems such action necessary to assure that such articles will not be adulterated." 21 U.S.C. § 463(a). The PPIA gives the Secretary similarly broad discretion over when and how ante-mortem and

post-mortem poultry inspections are to occur. 21 U.S.C. § 455(a)–(b). Nevertheless, as discussed above, the PPIA does not provide express statutory authority to mandate the "humane" treatment of animals, nor is poultry included in the definition of "livestock" under the Humane Methods of Slaughter Act. *Notice*, 2005 WL 2367279.

The Court finds that it was not an abuse of discretion or inconsistent with the law for Defendants to deny Plaintiffs' rulemaking petitions on the stated grounds. Defendants rightly noted that "the PPIA does not give [them] specific authority to prescribe requirements for the humane handling of live birds" (AR 010706), and pointed to two specific regulations relevant to the petitions' stated aim of reducing adulterated poultry on the market (AR010707).

First, Defendants pointed out that 9 C.F.R. § 381.90 screens out adulterated poultry by requiring poultry carcasses showing evidence of having died by a cause other than slaughter to be condemned. AR010707. Second, Defendants observed that 9 C.F.R. § 381.65(b) requires poultry to be slaughtered in accordance with "Good Commercial Practices" (GCPs), namely, in a manner that results in the thorough bleeding of poultry carcasses, and ensures that breathing has stopped before scalding so that the birds do not drown. AR010707. Additionally, Defendants described the ante-mortem and post-mortem inspection regimes they have implemented in order to drive compliance with the regulations. AR010707. In short, Defendants' reasoned decision considered the factors relevant to poultry adulteration, and was not an abuse of discretion or contrary to law.

CONCLUSION

Accordingly, it is hereby,

ORDERED that Plaintiff's motion for summary judgment [ECF No. 34] is denied; and it is further

ORDERED that Defendants' motion for summary judgment [ECF No. 39] is granted.

The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      October 31, 2022
            Rochester, New York

ENTER:

CHARLES J. SIRAGUSA
United States District Judge